CARMEN GLORIA RIPOLL ALZURU, peticionaria y recurrida, *v.* CARMEN MARÍA ROSA PAGÁN, interventora y recurrente.

*Número:* R-85-180          *Resuelto:* 15 de abril de 1988

*Francisco C. Santaella Conde* y *Alberto Picó*, de *Brown, Newsom & Córdova*, abogados de la recurrente; *Antonio Fernós López-Cepero*, abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

¿Tiene derecho a la cuota viudal usufructuaria un ex cónyuge divorciado por la causal de separación? Expongamos los hechos que motivan esta interrogante.

I

El 8 de octubre de 1980, el Tribunal Superior, Sala de San Juan, dictó sentencia de divorcio por la causal de *separación* y disolvió el vínculo matrimonial existente entre Carmen María Rosa Pagán y Emilio Ripoll Dávila.(1) El 18 de febrero de 1984, éste falleció sin haber contraído nuevas nupcias. Una de sus hijas, Carmen Gloria Ripoll Alzuru, presentó en el Tribunal Superior, Sala de Bayamón, petición *ex parte* sobre declaratoria de herederos y solicitó que se declararan únicos y universales herederos a sus hijos. Dicho foro accedió. Pocos días después, su ex cónyuge Carmen María —quien tampoco se había vuelto a casar— intervino y solicitó que se reconociera su derecho a la cuota viudal usufructuaria

---

(1) La cronología de eventos filiatorios y matrimoniales durante la existencia del causante Ripoll Dávila comienza desde el 1938. Cuando el causante Ripoll Dávila era estudiante procreó una hija nacida de relaciones extramaritales oportunamente reconocida. El 4 de octubre de 1942 se casó con Carmen María Alzuru Rivera de cuyo matrimonio nacieron Carmen Gloria y Emilio. Esta unión quedó disuelta por divorcio favorable instado por Carmen Gloria, por trato cruel mediante sentencia del Tribunal Superior, Sala de San Juan, de 15 de junio de 1956. El 29 de noviembre de ese año contrajo segundas nupcias con Carmen M. Rosa Pagán, de cuyo enlace procrearon a Mariaemil y Jorge. Este vínculo duró hasta el 8 de octubre de 1980, cuando se decretó el divorcio.

en el caudal de Emilio. El tribunal acogió su reclamo y dictó resolución enmendada. Sin embargo, subsiguientemente, ante las objeciones y planteamientos de Carmen Gloria, el tribunal dejó sin efecto la resolución enmendada y reinstaló su resolución original.

El ilustrado foro de instancia fundó su negativa en una interpretación de los Arts. 761 y 96(9) del Código Civil, 31 L.P.R.A. secs. 2411 y 321(9), a la luz de las enmiendas efectuadas por las Leyes Núms. 101 de 2 de junio de 1976 y 183 de 26 de julio de 1979. Al hacerlo, el tribunal expresamente evitó el planteamiento expositivo de inconstitucionalidad levantado por Carmen Gloria en cuanto a que la concesión de usufructo violaba el debido proceso de ley. A tal efecto concluyó el tribunal que el derecho a la cuota viudal usufructuaria, consignado en el Art. 761 del Código Civil, *supra*, requiere, en adición a que el cónyuge supérstite sea inocente, que el difunto sea declarado culpable. Razonó que, por interacción, en vista de que el Art. 96 del Código Civil, 31 L.P.R.A. sec. 321, establece que *ambos cónyuges han de ser considerados inocentes*, es imposible que jurídicamente el cónyuge difunto pueda ser considerado culpable a los fines del Art. 761 del Código Civil, *supra*.

No conforme, la interventora Carmen María recurrió ante nos para argumentar que las enmiendas efectuadas al inciso (9) del Art. 96 del Código Civil, *supra*, no tuvieron el propósito de eliminar el derecho a la cuota viudal del cónyuge supérstite en casos de divorcio por la causal de separación. Apúntala su derecho a la cuota viudal en *Marxuach v. Registrador*, 57 D.P.R. 134 (1940). Expedimos.

## II

Para precisar los horizontes jurídicos de la figura de la *cuota viudal usufructuaria*, es de rigor una breve incursión en sus antecedentes históricos. Así podemos entender mejor sus orígenes y, por ende, la filosofía jurídica, que como ór-

gano vital, late y da vida institucional a su sobrevivencia histórica. Como veremos, aunque sencillo en su exposición, el debate doctrinario sobre la razón de ser de la cuota viudal usufructuaria no es exclusivo de este siglo.

En esta misión, por su entronque con nuestro Código Civil, es menester retrotraernos a España. Los estudiosos reconocen que en el derecho antiguo el llamado *derecho de viudedad* español tuvo cierta semejanza con dos fuentes principales, en Roma y en el derecho germánico. En Roma, con la denominada *quarta uxora*, en la época de Justiniano, promulgada "para la viuda pobre o indotada". F. Puig Peña, *Compendio de Derecho Civil Español*, 3ra ed. rev., Madrid, Ed. Pirámide, 1976, T. VI, pág. 479. Manresa nos señala que en la sociedad especial de aquel período ni aun los hijos y descendientes tuvieron *por derecho civil* una legítima reconocida. Expone:

> Justiniano dispuso que si alguno por solo afecto casase con mujer sin dote y la repudiara después sin justa causa, debía entregar a dicha mujer la cuarta parte de sus bienes.
>
> Así nació la llamada *cuarta marital*. Pensóse más tarde que lo que se concedía en caso de repudiación debía concederse también lógicamente en caso de muerte, y de aquí un nuevo precepto que asignaba a la viuda indotada la cuarta parte de los bienes de la herencia de su marido, siempre que dicha cuarta parte no excediese de 100 libras oro.
>
> Por último, el mismo Justiniano, en la Novela 117, publicada en el año 541, modificó su doctrina, disponiendo que la viuda pobre recibiese la expresada cuarta parte *en propiedad* cuando concurriese a la herencia testada de su difunto consorte con personas que no fuesen descendientes; pero que, en concurrencia con hijos, sólo tendría una cuota *usufructuaria*, que sería igual a la de cada uno de esos hijos si quedaban más de tres de estos mismos hijos, y de una cuarta parte fija si quedaban tres o menos de tres. (Énfasis en el original.) J.M. Manresa, *Comentarios al Código Civil Español*, 8va ed. rev., Madrid, Ed. Reus, 1973, Vol. 1, T. 6, pág. 844.

Desde esta visión, el derecho fue establecido para remediar la condición de la viuda pobre, indotada. J. Castán, *La sucesión del cónyuge viudo, y el problema de las legislaciones forales*, 125 Rev. Gen. Leg. Jur. 436 (1914); Q.M. Scaevola, *Código Civil*, 4ta ed., Madrid, Inst. Ed. Reus, 1944, T. XIV, pág. 639. Aparte del normal sentir romanista, se cree que la raíz del usufructo viudal está en las costumbres germanas que "miraron a la mujer con suma benignidad. En el hogar y en la ley, la mujer germana alcanzó mayor prestigio que la mujer romana. El espíritu nivelador mostróse más expansivo en los bosques de la Germania que en las ciudades del Lacio, y por eso no es de extrañar que la mujer germana cuando enviudaba tuviera una parte igual en usufructo a la porción que correspondiese a sus hijos en la herencia paterna". Scaevola, *op. cit.*; Manresa, *op. cit.*, pág. 844; Castán, *supra*, pág. 437.

Más adelante, durante el tiempo medieval se manifiesta en el derecho foral de Navarra y Aragón. Scaevola consigna, como se le atribuye, que "nació de las costumbres y necesidades de la Reconquista y del espíritu galante y caballeresco de la Edad Media". Scaevola, *op. cit.*, pág. 636. Cuando el infanzón salía a campaña procuraba asegurar el porvenir de su mujer, caso que él pereciera en la lucha, mediante el derecho de la viudad. Íd., pág. 637. Se acepta, sin embargo, que no fue su "propósito exclusivo de favorecer a la viuda, sino más bien el de robustecer y perpetuar la familia mediante la no disgregación del patrimonio familiar". Íd.

Castán expresa que el "usufructo de viudedad . . . concilia y equilibra sabiamente los derechos del parentesco espiritual del amor con los del parentesco físico de la sangre . . . [y a]parece, al calor de las costumbres y de una sólida adhesión familiar, en aquella época de espontaneidad jurídica que se

6

inaugura en nuestra Patria con la Reconquista". Castán, *supra*, Vol. 126, págs. 26–27.([2])

Y así es, como para el siglo XIX, durante el tránsito hacia la codificación, se pensó en trasladar al código "el espléndido usufructo vidual de las legislaciones forales" y no se aceptó, pues se prefirió una fórmula con asiento en la legislación castellana de acuerdo con el Fuero Juzgo. Puig Peña, *op. cit.*, pág. 480. A la postre, se incorpora en el Art. 834 del Código Civil español el usufructo viudal *universal*, esto es, como derecho exigible tanto en la sucesión testada como intestada.

El fundamento social, digámoslo así, de la institución cuyo origen histórico pretendemos señalar, no fue robustecer la familia, perpetuando el conjunto orgánico de las [*sic*] misma mientras subsistiese la madre, sino amparar a la viuda, evitar que desde la altura de su posición económica en el matrimonio descendiese de repente, por efecto de un hecho fortuíto, la muerte del marido, al estado de pobreza, en tanto sus descen-

---

([2]) En su abono reproduce lo siguiente:

"El legislador tuvo bien presentes á uno y a otros (viudo y colaterales). Para el primero, que no pudo arraigar con su sangre en el campo del muerto, guarda derechos sin raíces, meramente personales, intrasmisibles fuera de su órbita, que no iba a premiar una esterilidad deplorable con una fortuna hereditaria. Para los segundos, por cuyo cauce de familia se derivaron los bienes del intestado o el genio emprendedor para aquistarlos, guarda derechos arraigados reales, derechos que en mucha parte son restituciones —*devolvantur*, dice el Fuero— y los guarda, porque la viudez es mortal, individual y sin trascendencia; mero accidente en la peregrinación larga de las familias y la consanguinidad es permanente, social, inmortal, porque la muerte de los colaterales no significa la destrucción de una estirpe. Ramón Ortega, Fueros de Aragón, ¿*Hereda el cónyuge viudo en el abintestato*? (En la Correspondencia de España, 3 de Agosto de 1914)." J. Castán, *La sucesión del cónyuge viudo y el problema de las legislaciones forales*, 126 Rev. Gen. Leg. Jur. 26, esc. 1 (1915).

Y más adelante cita del *Ensayo Histórico-Crítico* de F. Martínez Marina:

"Nuestros legisladores, para estrechar más el nudo matrimonial y dar mayor firmeza al mutuo amor de los casados, y hacerles concebir ideas grandiosas del matrimonio, extendieron sus providencias y miras políticas aun más allá de la vida de cada cual de los consortes, honrando la viudedad, haciendo que se respetase la condición de las viudas, proporcionando a éstas medios de subsistir con decoro y comodidad; obligándolas por motivos de honor y de interés a permanecer en ese estado, entregadas al duelo y llanto de sus difuntos maridos." Castán, *supra*, pág. 27.

dientes, concebidos y criados por ella, repartían entre sí el patrimonio paterno. Por eso en sus orígenes el usufructo sólo se concede a la viuda mientras permanezca en tal estado, y es preciso avanzar hasta fecha relativamente cercana para encontrar en las viudedades forales de Navarra y Aragón y por la influencia consuetudinaria, el espíritu de igualdad entre ambos consortes, *determinando el objetivo fundamental del usufructo, el mantenimiento y cohesión de la familia como un todo orgánico parental y económico.* (Énfasis suplido.) Scaevola, *op. cit.*, pág. 640.

El criterio de Manresa guarda igual sintonía:

Así lo exigía la razón y la justicia. La mujer, el marido y los hijos constituyen la verdadera familia. Los lazos del cariño y consideración que unen a los cónyuges, las dichas y penalidades compartidas por ambos, no consienten que el que lo era todo en su hogar quede postergado, y tal vez en el desamparo, cuando falta el compañero de su vida. Tan sagrado como el derecho de los hijos es el derecho de los cónyuges, una vez aceptado el sistema de legítimas o a falta de todo acto de última voluntad, y lo que a unos se les concede, no puede negársele a otro. Manresa, *op. cit.*, pág. 871.

En resumen, la filosofía del usufructo viudal obedeció a unas actitudes afectivas, morales y sentimentales, pero también a unas realidades económicas e históricas. Como concreción jurídica la legítima del cónyuge viudo respondió a dos intereses legítimos: "amparar y enaltecer a la mujer viuda." Scaevola, *op. cit.*, pág. 651. Se considera al cónyuge verdadero y legítimo, y "trátase de un derecho recíproco, moldeado al fuego del mutuo cariño, *y desechado por tanto cuando,* por faltar esta condición, el lazo conyugal se rompe violentamente con el divorcio". (Énfasis suplido.) Scaevola, *op. cit.*, pág. 666.

De Diego inquiere:

¿[P]odrá negarse el natural derecho sucesorio que corresponde al viudo o viuda, *no separado por sentencia de divorcio,* en su cualidad de heredero legitimario o forzoso con respecto

a la herencia de su difunto consorte? El matrimonio es el origen de la familia, el brote y fundamento de ella; de los cónyuges, si se dice que no son parientes, es porque constituyen una unidad superior de persona social, tanta y tan intensa es la comunidad de su vida y la identificación de sus afectos: *erunt duo in carne una*. ¿Es posible concebir que los que en vida se fundieron en uno para engendrar y constituir una familia, corriendo la misma suerte y sirviendo a un común destino, queden extrañados el uno al otro en la hora de la muerte? ¿No participaron en la formación del hogar, en sus afanes y en sus penas, prosperidad y adversidad, y en la constitución del caudal común? F.C. De Diego y Gutiérrez, *Instituciones de Derecho Civil Español*, Madrid, Ed. Artes Gráficas Julio San Martín, 1959, T. II, págs. 218–219.

El usufructo viudal tiene un fin económico como lo demuestra su susceptibilidad de ser transformado mediante su equivalencia compensatoria. De Diego y Gutiérrez, *op. cit.*, pág. 223. Requiere la integridad y normalidad en las relaciones matrimoniales. Íd. Ese factor es el fundamento que le atribuye sucesión al parentesco por afinidad. Puig Peña, *op. cit.*, pág. 481. Valverde nos dice "que el afecto es otro fundamento de aquélla y no puede dudarse, que entre los esposos bien avenidos el afecto desinteresado e íntimo existe; y además, si el cónyuge como afirma Boistel, permanece fiel al muerto, subsiste la unión espiritual que entre ambos había, y aquella unión es razón bastante para que se le atribuya una participación en la herencia del fallecido". C. Valverde y Valverde, *Tratado de Derecho Civil Español*, 4ta ed., Valladolid, Talleres Tipográficos Cuesta, 1939, T. 5, pág. 245. "De cualquier forma, la muerte de uno de los cónyuges divorciados ocurrida después de la sentencia firme de divorcio que conserve validez en la actualidad no origina el nacimiento del estado de viudez en el supérstite." G. García Cantero, *Estudios de Derecho Público y Privado*, Valladolid, Ed. Sever Cuesta, 1966, T. 1, pág. 267.

Sobre el evento de nuevo matrimonio como razón para dar por terminado el usufructo, Castán nos ofrece la si-

guiente explicación: "El cónyuge que se casa de nuevo —dice Roguin— se separa moral y económicamente de su primera familia, con la cual se encontrará frecuentemente desavenido. En general, el segundo esposo de este cónyuge tendrá recursos personales equivalentes al derecho hereditario afectado a este último en la sucesión del premuerto. En fin, y sobre todo, parece poco justo hacer contribuir una primera familia a la manutención de una segunda." Castán, *supra*, Vol. 126, pág. 36. Esta visión se sustenta en el señalamiento de que la sociedad conyugal "se rompe al contraer el sobreviviente segundo matrimonio, porque no cabe la ficción de continuar una sociedad conyugal dentro de otra. Y entonces, al descomponerse aquélla, el cónyuge tiene derecho a su parte familiar, de colaboración —gananciales—, pero los bienes propios o exclusivos del otro cónyuge, que no pueden resignarse a pasar a una familia extraña, vuelven, buscando el tronco de que proceden, a los parientes de sangre del que los aportó al matrimonio". Íd., pág. 84.

En cuanto al concepto de culpa, si se hallaran separados por divorcio —conforme este concepto jurídico era entendido en España, a distinción del divorcio vincular en Puerto Rico, según veremos— afirma Manresa que la "ley impone *un castigo justo al único que lo merece*, al que dio lugar a la separación judicial de los esposos, al que quebrantó los lazos del matrimonio y se hizo indigno de toda merced por parte de su consorte o parte de la ley. Sería inicuo que, tras la ofensa inferida, *la ley arrancase una parte del patrimonio del inocente para dársela al culpable. El cónyuge que dio motivo al divorcio, pierde, por tanto, todo derecho en la sucesión testada del cónyuge difunto . . .".* (Énfasis suplido.) Manresa, *op. cit.*, pág. 892. La privación de dicho usufructo viudal al culpable de la separación —afirma Puig Peña siguiendo a Scaevola— es "a título de pena". Puig Peña, *op. cit.*, pág. 485.

Puig Brutau, con su reputada capacidad para examinar sistemáticamente las instituciones del Código Civil, acertadamente concluye que antes de procederse a regular la legítima del viudo, lo que hay son "unas necesidades sociales que deben ser resueltas *con criterios de política jurídica*". Con alusión a Rheinstein, destaca que un "derecho prontamente sucesorio a favor del cónyuge supérstite será tanto más necesario cuando, por haber vivido el matrimonio bajo un régimen matrimonial de absoluta separación de bienes no exista un derecho de participar en las ganancias obtenidas en vida por el premuerto". J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1977, T. V, Vol. 3, págs. 106–107.

■ El momento determinante para la concesión del usufructo es el de la muerte del causante, suceso que da génesis a ese derecho. Ello significa la existencia de un matrimonio válido. Valga aclarar que, salvo el breve período de la segunda República Española —en virtud de la Ley de Divorcio de 2 de mayo de 1932— y hasta la Ley de 7 de julio de 1981, España no reconoció el divorcio vincular. Durante toda su historia era meramente separación de "tálamo y mesa", esto es, indisoluble hasta la muerte. J.L. Lacruz Berdejo y otros, *El nuevo régimen de la familia*, 3ra ed., Madrid, Ed. Civitas, 1982, págs. 19–78; E. Valladares, *Nulidad, separación, divorcio: comentarios a la Ley de Reforma del Matrimonio*, Madrid, Ed. Civitas, 1985, pág. 11.

No se discute que hoy en día en España el "divorcio, como ruptura del lazo conyugal, comporta en su consecuencia la desaparición de los derechos sucesorios. . . . Cuando uno de los esposos muere después de haberse divorciado, *su ex cónyuge no tiene ningún derecho sobre su sucesión, y recíprocamente, pues el divorcio acarrea la pérdida de los derechos sucesorios.* Naturalmente, si después del divorcio se vuelve a casar, el nuevo cónyuge adquiere derechos sobre

dicha sucesión, y estos derechos se interfieren con los derechos de todos aquellos hijos que existan, pues la Ley también considerará al viudo o viuda como heredero forzoso y tendrá por tanto, derechos legitimarios en la sucesión del cónyuge difunto". (Énfasis suplido). J.M. Alemañy Boguña, J. Amat Cortés y J. Amat Bor, *Guía Práctica del Divorcio*, 2da ed., Barcelona, Ed. Bosch, 1986, pág. 92; J. Vallet de Goytisolo, *Comentarios al Código Civil y compilaciones forales*, 2da ed., Madrid, Ed. Edersa, 1982, T. II, pág. 47.

Ese derecho "presupone un matrimonio vigente, es decir existente ya y no disuelto por otra causa antes del óbito del causante". Lacruz Berdejo, *op. cit.*, pág. 89. A partir de esta visión panorámica concentremos en el reclamo de la interventora Carmen María.

## III

Ella funda su derecho en el Art. 761 del Código Civil, *supra*, vigente. En lo pertinente, dispone que:

> El viudo o viuda que al morir su consorte no se hallare divorciado, *o lo estuviere por culpa del cónyuge difunto*, tendrá derecho a una cuota, en usufructo, igual a la que por legítima corresponda a cada uno de sus hijos o descendientes legítimos no mejorados. (Énfasis suplido.)

Según sus antecedentes, este precepto proviene del Art. 834 del antiguo Código Civil español. Para entonces la Madre Patria no admitía la rotura total del vínculo matrimonial mediante el divorcio. Ya desde *Celis Alquier v. Méndez*, 18 D.P.R. 88, 91 (1918), habíamos detectado esta diferencia y adjudicado distintos efectos, a saber, que el sistema de divorcio promulgado por el Gobierno Militar el 24 de marzo de 1899, era diferente al de España. Aquí conllevaba rotura vincular total, mientras que allá era por su naturaleza perpetua e indisoluble. En la Madre Patria el vocablo *divorcio* no correspondía al divorcio vincular, sino al de separación de

"mesa y tálamo" (*mensa et thoro*). Ello explica, conforme al Art. 834 del Código Civil español —que rigió hasta el 1889— que el derecho a la cuota usufructuaria en los bienes del causante se adscribe a quien ostenta la condición de *viudo*, esto es, *separado* del fallecido por culpa de éste. Las disposiciones de la Orden Militar sobre el divorcio vincular quedaron incorporadas en nuestro Código Civil revisado de 1902. Anómalamente se transcribió el Art. 834 español como el Art. 761 nuestro, *supra*. Así, en *Celis Alquier v. Méndez,* supra, págs. 92, 93, al destacar que los "tribunales al interpretar leyes dudosas, deben tener presente la historia de la época en que se promulgaron", resolvimos que si bien la Ley de 9 de marzo de 1905 restauró los preceptos del antiguo Código Civil, dejó intocada la legislación referente al nuevo sistema de divorcio, en que el "objeto y fin únicos de una acción de divorcio continuaron siendo, el obtener la sentencia de divorcio *o sea el disolver el vínculo matrimonial".* (Énfasis suplido.) Finalmente, por estimarlo un resultado absurdo, contrario al axioma de que la "ley no puede permitir que se hagan cosas inútiles y vanas" (íd.), concluimos que había sido una *inadvertencia* del legislador al copiar de la antigua ley española la disposición preceptiva de que si los cónyuges estaban separados por demanda de divorcio estaría a las resultancias del pleito la determinación sobre la cuota usufructuaria. No obstante este decreto judicial, y la advertencia del Dr. Luis Muñoz Morales[3] de que, por los efectos del divorcio "no hay derecho a cuota usufructuaria", dicha disposición continuó inalterada en el Código Civil de 1930 y hasta el presente.

Posteriormente, el derecho sobre usufructo viudal entre ex cónyuges fue examinado en varios casos. En *Tormes Ex parte,* 53 D.P.R. 417, 421, 422 (1938), el causante falleció en

---

[3] L. Muñoz Morales, *Reseña histórica y anotaciones al Código Civil de Puerto Rico,* Río Piedras, Junta Editora de la U.P.R., 1947, págs. 231, 234.

1936 habiéndose divorciado de Herminia Tormes, quien fue declarada cónyuge inocente. No obstante, ella volvió a contraer matrimonio, por lo que la cuota viudal en la herencia de su anterior consorte le fue denegada. Al confirmar reconocimos su origen ibérico y que:

> ¿Subsistía "en toda su fuerza y validez" el día 24 de noviembre de 1936 el matrimonio entre Leopoldo Lanausse y Herminia Tormes García? Dados los efectos que conlleva en Puerto Rico una sentencia de divorcio, tenemos que contestar negativamente la pregunta. *No puede subsistir lo que ha quedado roto y disuelto. Después del divorcio, de aquel lazo que llamamos vínculo, sólo quedan en ocasiones, hijos que evocan su recuerdo. Lo demás se extingue.* (Énfasis suplido.) *Tormes Ex parte*, supra, pág. 421.

Finalmente,

> [N]o *subsistiendo matrimonio no existe el cónyuge, y no existiendo el cónyuge no nace el derecho. El artículo 761 del Código Civil de Puerto Rico no tiene, pues, aplicación en casos de divorcio, y ello es así aún cuando el cónyuge supérstite estuviere divorciado por culpa del difunto.* (Énfasis suplido.) *Tormes Ex parte*, supra, pág. 422.

A este nítido razonamiento —que debió ser suficiente para adjudicar correctamente el caso— añadimos como "*razón adicional* de que en esa época la peticionaria ya había contraído nuevas nupcias y era la esposa legítima de Guillermo Beauchamp. No podía la apelante ser a un mismo tiempo viuda y casada". *Tormes Ex parte*, supra.

El tiempo se encargaría de convertir esta última expresión en el *ratio decidendi* para pautar posteriormente toda nuestra doctrina jurisprudencial. La decisión recayó en *Marxuach v. Registrador*, supra. En ese caso, ninguno había vuelto a casarse. Al igual que en *Tormes Ex parte*, supra, ella había sido declarada cónyuge inocente.

Al inscribir en el Registro de la Propiedad una copia de una resolución del tribunal sobre dos inmuebles pertene-

cientes al causante, el Registrador hizo constar que ello era sin perjuicio de la cuota usufructuaria correspondiente a la ex esposa y viuda del causante. Este Foro sostuvo la nota. Se ratificó la conclusión de que el Código Civil de 1902 no reconocía "derecho alguno a favor del cónyuge divorciado por culpa del difunto". Sin embargo, en virtud de las enmiendas en el 1905, la Ley Núm. 73 de 9 de marzo de 1911 (1911 Leyes de Puerto Rico 247) y la adopción del Código Civil en 1930, se estimó:

> El propósito evidente del legislador al eliminar del Código Civil de 1902 las disposiciones del artículo 834 del español, no podía ser otro que el de no conceder cuota usufructuaria alguna al cónyuge supérstite divorciado, aun cuando no fuera él o ella el culpable del divorcio. La intención legislativa al adoptar el vigente artículo 761, no obstante lo dispuesto en el 163, *tiene que haber sido la de conceder iguales derechos que al viudo o viuda que al morir su consorte no estuviere divorciado, al cónyuge supérstite que estuviere divorciado al morir su consorte, por culpa de éste.* Nos inclinamos a sostener la nota recurrida, no solamente por la claridad y precisión con que se ha redactado el estatuto, si que también porque *no estamos autorizados* para resolver que la disposición del primer párrafo del artículo 761, supra, *referente al Cónyuge supérstite divorciado e inocente carece en absoluto de validez y no significa nada.* Para resolverlo así, tendríamos que asumir, en contra de la lógica y del lenguaje claro y preciso del estatuto, que la intención que tuvo el legislador al aprobar el artículo 761 *fue la de castigar al cónyuge inocente y cumplidor de sus deberes matrimoniales, privándole de toda participación en la herencia del culpable.* (Énfasis suplido.) *Marxuach v. Registrador,* supra, págs. 138–139.

En *Pirela v. Registrador,* 65 D.P.R. 955 (1946), el causante se divorció, porque era cónyuge culpable. Al momento de su muerte, había vuelto a casarse. El Registrador inscribió la resolución que declara los herederos del causante sin perjuicio de la cuota usufructuaria que pudiera corresponder

a la ex cónyuge del causante. Se revocó la nota bajo el fundamento siguiente:

> El artículo 761 del Código Civil establece el derecho a cuota usufructuaria a favor de una sola persona: "el viudo o viuda que al morir su consorte no se hallare divorciado, o lo estuviere por culpa del cónyuge difunto." En el caso de Marxuach, el *status creado por la sentencia de divorcio se mantuvo intacto hasta el momento de la muerte de Marxuach, pues ni él ni ella habían contraído nuevas nupcias.* Por eso fué que su ex esposa pudo reclamar la cuota usufructuaria como viuda que al morir su consorte se encontraba divorciada por culpa del cónyuge difunto. En el presente caso Esperanza Suárez, la primera esposa, no podría alegar que ella quedó viuda al fallecer Figueroa, pues éste estaba casado con la recurrente. Es ésta la única que puede reclamar los derechos correspondientes a la viuda del causante. Para *sostener lo contrario tendríamos que admitir la posibilidad legal de que un hombre muera dejando dos o más viudas.* (Énfasis suplido.) *Pirela v. Registrador,* supra, pág. 959.

Subsiguientemente, reafirmamos esta casuística en *Vidal v. Monagas,* 66 D.P.R. 622, 640 (1946); *López Valdés v. Tribunal Superior,* 96 D.P.R. 779, 790 (1968). Y más reciente, *sub silentio,* lo hicimos en *Betancourt v. Ruiz,* 115 D.P.R. 450 (1984), no obstante un ilustrador voto disidente del ex Juez Asociado Señor Irizarry Yunqué.

Esta jurisprudencia tan poco uniforme ha levantado serias críticas e interrogantes dirigidas a que se modifique la norma en torno a los derechos sucesorios del cónyuge divorciado.(4)

---

(4) Se nos ha propuesto que la doctrina jurisprudencial incoada en *Marxuach v. Registrador,* 57 D.P.R. 134 (1940) —en virtud del divorcio absoluto— sea revocada para disponer que ninguno de los ex cónyuges reciba participación hereditaria en la herencia, independientemente de quién haya sido el cónyuge inocente. L. Muñoz Morales, *Derecho del Cónyuge Divorciado,* 10 Rev. Jur. U.P.R. 197, 226 (1940); D. Toledo Álamo, *Exigibilidad de las Obligaciones Mercantiles,* 19 Rev. Jur. U.P.R. 1, 7, n. 11 (1949); G. Velázquez, *Teoría del Derecho*

■ En ausencia de un reclamo constitucional debidamente fundamentado y planteado en un recurso, bajo la norma de abstención judicial, *declinamos por vía de interpretación desterrar de un plumazo el derecho total a la cuota viudal usufructuaria en casos de divorcio.* La modificación y restricción de los derechos sucesorios *es materia compleja que en su origen corresponde a la Asamblea Legislativa.* Aceptamos que de su faz es ilógico mantener la cuota entre ex cónyuges, pues el divorcio, entre sus efectos, termina el matrimonio y el régimen de la Sociedad de Gananciales. *Pero es misión que primordialmente recae en la Asamblea Legislativa el regular los efectos económicos del matrimonio y el divorcio.* Existen razones en favor y en contra de tipo socioeconómico que deben ser conciliadas estatutariamente. Además, la subsistencia del derecho a la cuota viudal usufructuaria entre ex cónyuges, en su función social,(5) suscita, entre otras, varias interrogantes. ¿Promueve la unidad y estabilidad marital y de la familia? ¿Contribuye a su desmembración económica? ¿Divide más que une? ¿Debe en justicia, más allá de la mitad del activo y neto ganancial, permitirse al cónyuge inocente supérstite divorciado algún aprovechamiento pecuniario de lo que indirectamente pudo

---

*Sucesorio Puertorriqueño*, Puerto Rico, Ed. Equity, 1968, Sec. 25, pág. 26; C.E. Mascareñas, *La disolución del matrimonio en el Derecho puertorriqueño*, 29 Rev. Jur. U.P.R. 269, 316–330 (1960); E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ramallo Bros. Printing, 1983, Vol. 1, págs. 90–92.

(5) "El matrimonio crea la familia y ésta no se escinde con la muerte de uno de los cónyuges. De él han surgido vínculos y afectos, necesidades, obligaciones y derechos que realizar, y no pueden quedar resueltos en un momento dado y fatal, como es el de la desaparición de uno de los dos cónyuges. En esta materia ha sido tan radical el individualismo de nuestro Código que aun en este caso pretende una atribución de la propiedad exclusiva y excluyente.

"Nunca con mejor sentido hay que hablar aquí de la *función social que el usufructo vidual está llamado a realizar*, pues no se trata tanto del beneficio personal y exclusivo que ha de reportar a aquel que se queda sin mayor amparo (especialmente cuando se trata de la mujer), sino mucho más de lograr la unidad de la familia y evitar la quiebra y disolución de esta base primaria de la sociedad." A. d'Ors y J. Bonet Coner, *El Problema de la División del Usufructo*, 5 Rev. Der. Civ. 102 (1952).

haber contribuido durante la vida del matrimonio? De ser ello justo, ¿debe hacerse valer ese derecho como compensatorio únicamente contra el activo económico neto del cónyuge culpable *en el momento de liquidarse los bienes gananciales*? Y sobretodo, ¿cabe por más tiempo sostener la ficción legislativa y mantener la condición de *viudo* a quien está divorciado?(6)

## IV

Contra este frágil trasfondo doctrinal e interrogantes de política pública que corresponden al Poder Legislativo, se suscita el presente recurso complicado con las enmiendas al Art. 96 del Código Civil, *supra*. Dicho precepto, vigente hoy —como cuando se decretó el divorcio por la causal de separación entre el finado Francisco Ripoll y la ex cónyuge interventora Carmen María— en lo pertinente dispone:

> La separación de ambos cónyuges por un período de tiempo sin interrupción de más de dos años; Disponiéndose que, probado satisfactoriamente la separación por el expresado tiempo de más de dos (2) años, al dictarse sentencia no se considerará a ninguno de los cónyuges inocente ni culpable. *Para los efectos de la sec. 2411 [Art. 761]. de este título se considerarán ambos cónyuges como inocentes.* (Énfasis suplido.)

La Ley Núm. 101 de 2 de junio de 1976 (31 L.P.R.A. sec. 321(9)), eliminó de la referida causal la designación automática de la *mujer como cónyuge inocente*. Luego, la Ley Núm. 183 de 26 de julio de 1979 (31 L.P.R.A. sec. 321(9)), añadió la referencia al Art. 761 del Código Civil, *supra*, que hemos enfatizado.

De entrada cabe señalar que el historial legislativo es escaso. Los informes de las Comisiones de lo Jurídico de

---

(6) "El *status* de viudedad es incompatible con los de casado y soltero. Se es casado o viudo, *pero no ambas cosas a la vez*." G. García Cantero, *Estudios de Derecho Público y Privado*, Valladolid, Ed. Sever Cuesta, T. 1, pág. 267.

ambos cuerpos son casi idénticos y arrojan poca luz. 33 Diario de Sesiones de la Asamblea Legislativa 76–77 (1979). Aun así, *es evidente que el Legislador optó por dejar intocado y no cambiar el Art. 761 del Código Civil, supra, esto es, modificar el derecho a la cuota al cónyuge supérstite que "se hallare divorciado, o lo estuviere por culpa del cónyuge difunto".* De esa actuación podemos inferir que estimó prudente seguir convalidando la inadvertencia incurrida al reincorporar dicha disposición al Código Civil en 1905 y el estado de *stare decisis* establecido a partir de *Marxuach v. Registrador,* supra, aun cuando de ello había sido alertado. En palabras recogidas en el disenso del Juez Asociado Señor Irizarry Yunqué, en *Betancourt v. Ruiz,* supra, pág. 458, *"se ha creado un estado de Derecho* que ha inducido al legislador *a dar por buena su doctrina y considerar,* como surge de la Ley Núm. 183 de 1979, que cuando *hay culpa en el divorcio el cónyuge tendrá derecho a la cuota viudal usufructuaria* al ocurrir el fallecimiento del cónyuge culpable". (Énfasis suplido.)

Hecha esta aclaración, ¿cuál es el verdadero alcance de este precepto según enmendado? Caben dos interpretaciones. Explorémoslas.

La primera, la que nos propone la interventora Carmen María, a saber, que la enmienda al Art. 96 del Código Civil, *supra,* sólo tuvo el propósito de eliminar vestigios del trato desigual que favorablemente se brindaba a las mujeres frente a los hombres. Arguye que la *mens* legislativa *no fue* excluir el derecho a la cuota viudal en casos de divorcio por la causal de separación. Sin embargo, reconoce que a raíz de esa enmienda surgió confusión en la comunidad jurídica sobre sus verdaderos efectos. A su juicio, ello movió a la Asamblea Legislativa a través de la Ley Núm. 183 de 1979, *supra,* a esclarecer la cuestión, esto es, que la cuota usufructuaria viudal no estaba exenta en los casos de divorciados por separación.

Según el enfoque propuesto, ambos cónyuges son inocentes y, por ende, mutuamente acreedores en su día —depende del suceso imprevisto, pero inexorable de la muerte— a dicha cuota.

■ No obstante, una reflexión profunda de esta sencilla solución demuestra sus complejidades. Advertimos que el Art. 761 del Código Civil, *supra*, no concede el derecho de usufructo al cónyuge divorciado per se. Lo configura únicamente cuando el ex cónyuge fallecido *haya sido el culpable del divorcio*. En su dimensión correcta, el texto exige que exista un cónyuge con *culpa*. Ello nos lleva a la segunda interpretación adoptada por la ilustrada sala sentenciadora.

Al respecto, dicho foro concluyó:

> Al eliminarse el concepto de culpa para la causal de separación, en cualquier divorcio decretado por esa causal se entenderá que no hay *culpa* de ninguno de los dos cónyuges. Como el Artículo 96, al hacer referencia al 761, hace mención s[ó]lo al concepto de inocencia, no puede darse la antinomia de considerar "culpable" a quien por virtud de la ley es considerado "inocente". Nótese, y lo reafirmamos recalcándolo una vez más, que si no hay cónyuge *culpable* del divorcio no hay derecho al usufructo. Y en divorcio por separación no hay cónyuge *culpable*; ambos cónyuges son inocentes. Habido, pues, un divorcio por esta causal, si cualquiera de los dos ex cónyuges muere posteriormente, no podrá ser considerado este (el finado) nunca, a los efectos del Art. 761 del Código Civil, como culpable del divorcio. *Secuela de esta conclusión es que el ex cónyuge sobreviviente, cuando el divorcio se decretó por separación, no tiene derecho a la cuota usufructuaria. Nos parece que esta es la más razonable interpretación del Artículo, que permite soslayar el problema constitucional planteado.* (Énfasis suplido y en el original.) Sentencia de 21 de marzo de 1985, pág. A-10.

■ Coincidimos con este razonamiento. La cuota usufructuaria en casos de divorcios siempre ha estado inexorablemente atada al concepto de culpa. Esa culpa, según

*Marxuach v. Registrador*, supra, se paga al perder la cuota. Para fines decisorios, asumimos la validez constitucional de la función social de la *culpa* como basamento en donde apuntalar la cuota. Ello acentúa más su carácter de elemento imprescindible, pues su significado neto es castigar al culpable y premiar al inocente.

◼ Aunque en aparente buena lógica, por virtud de la rotura vincular y total del divorcio, no debería existir la anomalía del derecho a la cuota viudal usufructuaria entre ex cónyuges, pues no subsiste la sociedad de gananciales que finalizó con dicho divorcio. La jurisprudencia anterior fue acertada en cuanto a los efectos del concepto de culpa. Antes no existía en nuestra jurisdicción el divorcio *sin culpa*. La Ley Núm. 101 de 1976, *supra*, eliminó la designación automática de la mujer como cónyuge inocente en la causal estatutaria de *separación*. Como resultado, ambos serían inocentes y, como corolario, ninguno culpable.[7]

La tesis de la interventora Carmen María de que "al presente ambos ex cónyuges tienen derecho a recibir la cuota" presenta el obstáculo insuperable de que si los dos son inocentes, ninguno es culpable. A su vez, si ninguno tiene *culpa*, hemos de rechazar que esa cualidad legal en *vida*, por el simple acto fortuito de la muerte, se trastoque y lo convierta en culpable. Semejante metamorfosis no cabe en nuestro derecho. La condición de inocentes en vida es indivisible en la muerte. No podemos aceptar que a dos seres humanos, que al amparo de la ley —uno frente al otro— ostentaron igual posición de inocencia, puede la muerte variar esa condición y condenar a uno. Rubricaríamos un anticlímax intolerable. El derecho no puede suplir e imputar el elemento de culpa entre cónyuges después de la muerte de uno de ellos. Si ambos

---

[7] Igual acontece en el divorcio por mutuo consentimiento en virtud de *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978).

fueron inocentes en vida, la ley no puede anatematizar y póstumamente declararlo culpable. Ese atributo sólo pertenece al Sumo Hacedor. Con la muerte cesó toda la personalidad natural y jurídica del ex cónyuge Ripoll Dávila, y como tal, sujeto inimputable en derecho. R. Ato del Avellanal, *Proyecciones jurídicas de la muerte en diversas ramas del derecho*, IX Rev. C. Abo. La Plata 87, 89 (1967); *Pueblo v. Morales Díaz*, 120 D.P.R. 249 (1987). La *vacante de cónyuge culpable* producida por la muerte no puede ser así llenada.

La interpretación del foro de instancia que aquí refrendamos —efectiva a partir de la Ley Núm. 101, *supra*— es razonable y sabiamente salva el estatuto del ataque directo sobre inconstitucionalidad.[8] *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 728 (1982); *Galarza Soto v. E.L.A.*, 109 D.P.R. 179, 180 (1979); *E.L.A. v. Aguayo*, 80 D.P.R. 552, 596 (1958).

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Hernández Denton emitió voto particular de conformidad. El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Rebollo López concurren solamente con el resultado por estimar que el Tribunal debió de una vez revocar la doctrina sentada en *Marxuach v. Registrador*, 57 D.P.R. 134 (1940).

---

[8] Repetimos, no se nos ha planteado persuasivamente una situación de aplicación retroactiva y discriminatoria de una ley, por razón de una clasificación impermisible que incida en la igualdad en el nacimiento. Aceptamos que todos los hijos son iguales y acreedores a los mismos derechos cualesquiera que haya sido la conducta de sus padres. *Quaere* si ese derecho de igualdad ante la ley incluye la íntegra participación de los bienes de su progenitor muerto sin diferencia por razón de nacimiento.

—O—

Voto particular emitido por el Juez Asociado Señor Hernández Denton.

En consideración a la complejidad del asunto, la deseabilidad de que este tipo de cambio se inicie en la Rama Legislativa y, finalmente, la norma de abstenernos de resolver controversias que no están bajo nuestra consideración, procede decidir este recurso según el correcto enfoque adjudicativo de la opinión mayoritaria.

Esta interpretación del Código Civil armoniza adecuadamente los serios conflictos lógicos y conceptuales entre los Arts. 761 y 96(9) del Código Civil, 31 L.P.R.A. secs. 2411 y 321(9). De esta manera nos *limitamos* prudentemente a resolver sólo la controversia de este caso: la imposición de la cuota viudal usufructuaria entre ex cónyuges divorciados bajo la causal de separación. Las normas de autolimitación judicial aconsejan que no ampliemos el alcance de nuestros pronunciamientos a controversias que no están ante este Foro.

Por estas razones coincidimos plenamente con el criterio de que "[e]n ausencia de un reclamo constitucional debidamente fundamentado y planteado en un recurso, bajo la norma de abstención judicial, declinamos por vía de interpretación desterrar de un plumazo el derecho total a la cuota viudal usufructuaria en casos de divorcio. La modificación y restricción de los derechos sucesorios es materia compleja que en su origen corresponde a la Asamblea Legislativa. Aceptamos que de su faz es ilógico mantener la cuota entre ex cónyuges, pues el divorcio, entre sus efectos, termina el matrimonio y el régimen de la Sociedad de Gananciales. Pero es misión que primordialmente recae en la Asamblea Legislativa el regular los efectos económicos del matrimonio y el divorcio. Existen razones en favor y en contra de tipo socioeconómico que deben ser conciliadas estatutariamente". (Énfasis suprimido.) Opinión mayoritaria, pág. 16.