Versión para imprimir


EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ángel Francisco Clavelo Pérez<br><br>    Peticionario<br><br>        v.<br><br>Gloria Ester Hernández García<br><br>    Recurrida | Certiorari<br><br>2010 TSPR 4<br><br>177 DPR \_\_\_\_ |

Número del Caso: CC-2007-1166

Fecha: 19 de enero de 2010

Tribunal de Apelaciones:

    Región Judicial de Arecibo

Jueza Ponente:
        Hon. Nydia M. Cotto Vives

Abogado de la Parte Peticionaria:

        Lcdo. Sixto Román Torres

Abogado de la Parte Recurrida:

        Lcdo. Jorge L. Marchand Heredia

Materia: Liquidación de Usufructo Viudal

Este documento constituye un documento oficial del    Tribunal Supremo que está sujeto a los cambios y correccione   s del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónic   a se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Ángel Francisco Clavelo Pérez<br>Peticionario<br><br>v.<br><br>Gloria Esther Hernández García<br>Recurrida | CC-2007-1166 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 19 de enero de 2010.

Tenemos ante nuestra consideración un asunto sobre el cual no nos hemos expresado hasta el presente. Se trata del efecto que pueda tener el matrimonio del cónyuge supérstite sobre el usufructo viudal. Específicamente, debemos resolver si en nuestro ordenamiento jurídico el usufructo viudal, que es la legítima del cónyuge supérstite, se extingue al éste contraer nuevas nupcias.[1]

---

[1] Hemos resuelto que un causante no puede imponer, en un testamento y como condición para que el cónyuge supérstite reciba su legítima, el que éste no contraiga nuevas nupcias. Véase: Díaz Lamoutte v. Luciano, 85 D.P.R. 834 (1962). Por otro lado, en Luce & Co. v. Cianchini, 76 D.P.R. 165 (1954), resolvimos que la viuda no aceptó el usufructo que el causante le ofreció en testamento, con la condición de que permaneciera viuda, sino que optó por el usufructo legal, por lo cual no estaba obligada a cumplir condición u obligación alguna. La controversia en el caso

Exponemos los hechos según fueron estipulados por las partes.

I

El 19 de agosto de 1995, el Sr. Ángel Francisco Clavelo Pérez contrajo matrimonio con doña Amelia García Peraza, madre de Gloria Esther Hernández García. Seis años después del casamiento, el 13 de junio de 2001, doña Amelia falleció intestada y el Tribunal de Primera Instancia declaró como únicos y universales herederos, a la señora Hernández García y al señor Clavelo Pérez, a quién reconoció como viudo. Desde el fallecimiento de doña Amelia, la señora Hernández García tiene el control exclusivo de los bienes del caudal, que consisten en dinero depositado en cuentas bancarias y bienes inmuebles dedicados al negocio de alquiler.

El señor Clavelo Pérez contrajo matrimonio nuevamente el 4 de junio de 2002. Tres años después, la señora Hernández García le entregó un cheque por $16,666.00, con el propósito de conmutar y satisfacer su cuota viudal usufructuaria. Por estar en desacuerdo con la cantidad del pago, el señor Clavelo Pérez endosó el cheque y se lo devolvió a la señora Hernández García. En vista de que los legitimarios de doña Amelia no lograron un acuerdo sobre el valor de la cuota usufructuaria, el señor Clavelo Pérez presentó, en el Tribunal de Primera Instancia, una demanda

_____

que hoy atendemos es distinta a las que ya hemos resuelto, en tanto aquí se plantea el matrimonio del viudo como causa de extinción del usufructo viudal en la sucesión intestada.

sobre liquidación de usufructo viudal. Tras varios trámites procesales, la señora Hernández García solicitó la desestimación de la reclamación, bajo el fundamento de que el señor Clavelo Pérez no tenía derecho a recibir el usufructo viudal porque había contraído nuevas nupcias. Argumentó que la condición precedente para que naciera el derecho a la cuota usufructuaria es la viudez y como el señor Clavelo Pérez ya no era viudo, no tenía derecho a dicha cuota.

Estipulados los hechos y trabada la controversia, el Tribunal de Primera Instancia resolvió que en nuestro ordenamiento jurídico no hay disposición legal que requiera que la legítima del viudo se extinga al éste contraer nuevas nupcias. Por lo tanto, le ordenó a la señora Hernández García pagarle al señor Clavelo Pérez la cuota usufructuaria que le correspondía.[2]

---

[2] El Tribunal de Primera Instancia le concedió al señor Clavelo Pérez $144,604.24 en pago del valor conmutado de su cuota usufructuaria sobre los bienes inmuebles y el capital líquido. Además, le otorgó $16,116.67 en concepto de una tercera parte de los cánones de alquiler devengados por los inmuebles, desde la fecha de la muerte de la causante hasta mayo de 2007. Finalmente, el tribunal adjudicador le ordenó a la heredera satisfacerle al viudo $483.33 mensuales, a partir de junio de 2007, hasta que la sentencia adviniera final y firme, en concepto de la tercera parte de los cánones de alquiler devengados. Cada plazo que no sea satisfecho, devengará intereses desde que se venza hasta su saldo total. El Tribunal de Primera Instancia ordenó, también, el pago de $6,000.00 en concepto de honorarios de abogado por temeridad y $1,277.25 por los honorarios estipulados del tasador. Estas dos sumas no se impugnan, ni en el recurso de apelación presentado ante el Tribunal de Apelaciones ni en el recurso de *certiorari* presentado ante nosotros.

Insatisfecha con la sentencia del foro de instancia, la señora Hernández García acudió al Tribunal de Apelaciones y alegó, en esencia, que aquel foro había errado al concluir que el derecho al usufructo viudal no se extingue cuando el viudo contrae matrimonio. El tribunal intermedio apelativo resolvió que el derecho al usufructo viudal termina cuando el viudo contrae nupcias. Concluyó, por tanto, que el señor Clavelo Pérez sólo tenía "derecho a disfrutar de la cuota usufructuaria viudal hasta la fecha en que contrajo nuevas nupcias y su estado civil pasó de soltero [por viudez] a casado". Así, el Tribunal de Apelaciones devolvió el caso al tribunal de instancia para que se hiciera el cómputo de la cuota usufructuaria desde la muerte de la causante hasta la fecha en que el señor Clavelo Pérez contrajo nuevo matrimonio.

Inconforme, el señor Clavelo Pérez recurre ante nosotros, mediante recurso de *certiorari* y alega que el Tribunal de Apelaciones erró al limitar o restringir su derecho a percibir la cuota usufructuaria viudal porque contrajo matrimonio, ya que esto constituye "preterición de la legítima viudal y un discrimen por razón de matrimonio prohibido por la Constitución del Estado Libre Asociado".

Expedimos el auto y, luego de un detenido examen del expediente y el derecho aplicable, estamos en posición de resolver.

II

A

Siempre que nos enfrentamos a una controversia nueva, relativa a una figura jurídica compleja, es necesario estudiarla y analizarla en todos sus detalles. En este caso es particularmente imprescindible estudiar el desarrollo histórico de los derechos sucesorios del cónyuge viudo, porque, según explica Cano Tello, éstos surgieron "en un marco jurídico social producto de una época y [están] más influidos que otras instituciones por criterios morales, religiosos y filosóficos mayoritariamente aceptados en determinado momento".[3]

Nuestro recorrido histórico comienza durante la dominación romana del territorio que actualmente es España, pues es en esa época que la doctrina identifica por primera vez una institución afín al usufructo viudal. Las leyes romanas no le reconocían ningún derecho hereditario al cónyuge supérstite en la sucesión del premuerto, hasta que en tiempos del emperador Justiniano se introdujo la cuarta

---

[3] C.A. Cano Tello, El artículo 834 del Código Civil desde la perspectiva de los derechos históricos y de los nuevos principios del derecho de familia español, en Centenario del Código Civil (1889-1989), Madrid, Ed. Centro de Estudios Ramón Areces,1990, T. I., pág. 393. El origen de los derechos sucesorios del cónyuge viudo es bastante moderno porque su propósito o finalidad era atendido por las instituciones del Derecho de familia de las legislaciones históricas. F. Puig Peña, Compendio de derecho civil español, 3ra ed., Madrid, Ed. Pirámides, 1976, T. VI, pág. 479. Entre dichas instituciones podemos identificar la dote romana de la mujer o la germánica del marido y los sistemas de comunidad matrimonial de bienes.

marital a favor de la mujer que no aportó dote, es decir, la esposa pobre.[4]   Más tarde, en la Novela 117, publicada en 541, se le atribuyó a la mujer el derecho en propiedad a dicha cuarta parte, cuando el marido muerto no tuviese descendencia y solamente el usufructo cuando la tuviese.[5]

A los romanos le sucedieron los godos, quienes invadieron la península ibérica hace mil quinientos años.[6] Entre los germanos, primero por costumbre y después mediante legislación, la viuda participaba en los bienes hereditarios del marido difunto.[7]   Pero, en este caso, era porque en dicha civilización se miraba a la mujer con "benevolencia",

---

[4] F.V. Bonet Ramón, Compendio de Derecho Civil, Madrid, Ed. Revista de Derecho Privado, 1965, T. V., pág. 614. Véase además: L. Roca-Sastre Muncunill, Derecho de Sucesiones, 2da ed., Barcelona, Ed. Bosch, 1997, T. II, 277.

[5]  F.V. Bonet Ramón, op. cit..

[6]  M. Rodríguez Ramos, Breve historia de los códigos puertorriqueños, 19 Rev. Jur. U.P.R. 233, 234 (1950).

[7] Íd.; C.A. Cano Tello, op. cit., pág. 394.   De hecho, se entiende que el usufructo universal de carácter legal, no recíproco, tiene su origen en las legislaciones germánicas de la Edad Media.   L. Roca-Sastre Muncunill, op. cit.. Entre las leyes bárbaras que primero acogieron como ley escrita los derechos sucesorios entre cónyuges, a través de la concesión de cuotas en usufructo a favor de la viuda, encontramos la Lex Wisigothorum, Lex Baiovariorum y Lex Burgundiorum.    L. Roca-Sastre Muncunill, op. cit., págs. 277-278; C.A. Cano Tello, op. cit., pág. 394.    De otra parte, el derecho islamítico, dentro de su escaso influjo sobre el derecho europeo moderno, ofrece un precedente importante al otorgar al cónyuge viudo derechos legitimarios en la sucesión del premuerto.   F.V. Bonet Ramón, op. cit., pág. 614; C.A. Cano Tello, op. cit., pág. 394.

lo cual elevaba su dignidad dentro de la familia.[8] Por eso, en el estatuto godo conocido como el Fuero Juzgo, redactado en Castilla en 1241, se le asignó a la viuda una cuota igual a la que por legítima recibirían sus hijos legítimos de la herencia paterna, mientras no contrajere nuevo matrimonio, pero con independencia de su posición social y económica.[9] La viuda tenía este derecho solamente cuando había hijos, porque lo que pretendía asegurar este cuerpo legal era la conservación de la familia.

Así las cosas, en el siglo ocho, los moros invadieron la mayor parte del territorio español, terminando con ello la dominación germana en la península.[10] Entonces, durante todo el periodo de reconquista, que se extendió hasta el siglo XV, la nobleza o regiones liberadas recibieron de los reyes privilegios o fueros.[11] Sin embargo, los preceptos del Fuero Juzgo mantuvieron vigencia en algunas regiones y se transformaron conforme al tiempo, la localidad, las costumbres y la guerra.[12] En Aragón, el derecho a usufructo se le concedió al cónyuge supérstite sobre todos los bienes

---

[8] Q. Mucius Scaevola, Código Civil Comentado y Concordado Extensivamente, Madrid, Imprenta de Ricardo Rojas, 1898, T. XIV, pág. 558.

[9] L. Roca-Sastre Muncunill, op. cit., pág. 278.

[10] M. Rodríguez Ramos, supra, pág. 235.

[11] Íd.

[12] J.M. Manresa y Navarro, Código Civil Español, 8va ed., Madrid, Reus, 1973, T. VI, Vol. I, pág. 849; Q. Mucius Scaevola, op. cit., pág. 557.

del premuerto, es decir, la ley impuso un usufructo viudal universal.[13]  Según este ordenamiento, el derecho de viudedad se extinguía si la viuda o viudo llevaba una vida pública deshonesta o contraía nuevo matrimonio, a menos que se le hubiese concedido de por vida y el consorte difunto no tuviese otros herederos forzosos, o se tratase de "casamiento en casa" autorizado, y de la consiguiente conversión del usufructo universal en ordinario.[14]

También, desde el siglo XIII, el Fuero General de Navarra estableció el usufructo de fidelidad o viudedad, que le otorgó al viudo o viuda el uso y disfrute de todos los bienes de su difunto consorte, mientras mantuviera fidelidad, es decir, mientras no contrajera nuevo matrimonio ni llevara una vida deshonesta.[15]  Estas causas de extinción

---

[13] L. Roca-Sastre Muncunill, op. cit., pág. 278.  En la Compilación de Huesca de 1247, se reconoció el usufructo universal como un beneficio legal concedido a la viuda sobre la totalidad de los bienes del cónyuge premuerto.  F.V. Bonet Ramón, op. cit., pág. 642.  Luego, las Cortes de Monzón de 130, aplicaron la institución al viudo. Íd.

[14] El "casamiento en casa" es un pacto consuetudinario que le permite al cónyuge supérstite conservar su derecho al usufructo viudal cuando contraiga un nuevo matrimonio "en la casa" del cónyuge premuerto.  F.V. Bonet Ramón, op. cit., pág. 648-649; Q. Mucius Scaevola, op. cit., pág. 577.  El usufructo aragonés es legal, pero los cónyuges pueden modificarlo en pacto o testamento, lo cual lo convierte en contractual. Q. Mucius Scaevola, op. cit., pág. 577-578.  Debemos indicar que en ausencia de pacto en contrario, en Aragón la ley vigente sobre el usufructo viudal afirma que éste se extingue por ulteriores nupcias. Véase: A. Real Pérez, Usufructo Universal del Cónyuge Viudo en el Código Civil, Madrid, Montecorvo, 1988, págs. 76-77.

[15] F.V. Bonet Ramón, op. cit., págs. 677-678, 680.  En Navarra, aún en tiempos actuales, la ley dispone que el esposo sobreviviente que desee conservar el usufructo

del usufructo viudal foral, que surgen de la legislación tanto de Navarra como de la aragonesa, demuestran que en dichos ordenamientos los derechos sucesorios del cónyuge viudo persiguen, además del propósito de favorecer a la viuda, el objetivo principal de "robustecer y perpetuar la familia dándole cohesión y vigor mediante la no disgregación del patrimonio familiar," a pesar de la muerte de uno de los esposos.[16]

Sin embargo, en Castilla, tras la reconquista, la concesión parcial de los fueros municipales borró todo vestigio del Fuero Juzgo con relación a los derechos del cónyuge viudo en la sucesión de su consorte.[17] Entonces, en el siglo XIII, cuando se había reconquistado la mayor parte

---

viudal, salvo pacto en contrario, tiene que mantenerse fiel al premuerto. A. Real Pérez, op. cit., págs. 80-81. Aunque en Cataluña también surgió un usufructo universal viudal de imposición legal, conocido como el Usaje *Vídua,* éste fue suprimido posteriormente. L. Roca-Sastre Muncunill, op. cit., pág. 278.

[16] Q. Mucius Scaevola, op. cit., pág. 558, 587-589. Scaevola cita a don Antonio Morales, representante de Navarra en la comisión de codificación española, en su Memoria para la codificación del Derecho navarro, quién explica el propósito del usufructo viudal foral de la manera siguiente:

No era una atención a la viuda desamparada; no era una parte de la herencia conferida al cónyuge supérstite en consideración al vínculo contraído: era una institución familiar que atendía a que la sociedad conyugal no se rompiese totalmente por el fallecimiento de uno de los cónyuges, a que continuase hasta la muerte de ambos sin disolverse la familia, no quedando el viudo o viuda sin relación ni enlace con los hijos, con separación de bienes como extraños. *Íd.,* pág. 587.

[17] C.A. Cano Tello, op. cit., pág. 396; J.M. Manresa y Navarro, op. cit., pág. 846-847. Véase además: Q. Mucius Scaevola, op. cit., pág. 583-585.

del territorio español, el derecho carecía de unidad y se comenzaron a realizar esfuerzos para resolver este problema.[18] Así surgieron las Partidas. Este cuerpo normativo, redactado durante el reinado de Alfonso X, resucitó la cuarta marital romana, de manera modificada.[19] Específicamente, le concedió a la viuda pobre, que no podía vivir honestamente de sus bienes, el derecho en propiedad a una cuarta parte en la herencia de su cónyuge premuerto, con independencia de que hubiese hijos.[20] Dicha ley pretendía proteger a la viuda en su carácter personal, más que a la institución familiar que era el bien tutelado por el Fuero Juzgo y las legislaciones forales.[21]

No obstante, ninguno de los esfuerzos realizados en ese tiempo logró unificar el derecho en el territorio español, hasta que, en el siglo XIX, las ideas políticas revolucionarias recogidas en el nuevo Código Civil francés hicieron renacer los deseos de lograr una codificación uniforme del derecho español.[22] Durante la elaboración del Proyecto de Código Civil español de 1851 y de la Ley de

---

[18] M. Rodríguez Ramos, supra, pág. 235. Para una discusión sobre la necesidad de la codificación civil en España, véase: F. Sánchez Román, La Codificación Civil en España: En sus dos periodos de preparación y consumación, Pamplona, Editorial Anacleta, 1890, págs. 5-7.

[19] F.V. Bonet Ramón, op. cit., págs. 615-616; C.A. Cano Tello, op. cit., pág. 396.

[20] C.A. Cano Tello, op. cit., pág. 397.

[21] Íd.

[22] M. Rodríguez Ramos, supra, pág. 235.

Bases de 11 de mayo de 1888, se discutió "honda y largamente" sobre la legítima del viudo.[23] Sin embargo, en ese momento histórico, la razón del usufructo viudal, además de proteger económicamente al cónyuge supérstite y a su familia, se expresó como sigue:

> …la intima sociedad que se forma entre marido y mujer, la comunión de afectos, la asidua y común participación en los trabajos de la vida, los cuidados que en común prestan a la prole, dan lugar a la formación de ciertos vínculos que la ley no puede ni debe desconocer.[24]

Los codificadores españoles estudiaron las diversas fórmulas adoptadas dentro y fuera del territorio español para proteger al cónyuge supérstite, entre éstas, las

---

[23] L. Roca-Sastre Muncunill, op. cit., pág. 279. El Proyecto del Código Civil español de 1851 daba al cónyuge una cuota legitimaria en propiedad y, en específico, aclaraba que "el cónyuge bínubo" no era acreedor de este derecho. F. Puig Peña, op. cit., pág. 480; J.M. Manresa y Navarro, op. cit., pág. 848. Luego, en 1880 se pensó adoptar el usufructo universal de las legislaciones forales. Íd. Entonces, la base 17 de la Ley de 11 de mayo de 1888 dispuso que había de establecerse a favor del viudo o viuda, el usufructo que algunas legislaciones especiales conceden, pero limitado a una cuota igual a la que por su legítima hubieran de percibir cada uno de los hijos, si los hubiere, y determinando los casos en que hubiera de cesar el usufructo. Véase la Discusión Parlamentaria del Código Civil, que recoge los discursos pronunciados en el Senado entre 1888 y 1889, coleccionados y publicados por la Revista de los Tribunales, Madrid, Centro Editorial de Góngora, 1891, pág. 11. Sin embargo, debemos resaltar que éstos no fueron los únicos intentos de codificación que hubo en España en el siglo XIX. Por el contrario, se presentaron varios proyectos frustrados en esa época. Para una discusión detallada sobre este tópico, véase: J. Baró Pazos, La Codificación del Derecho Civil en España (1808-1889), Santander, Servicio de Publicaciones de la Universidad de Cantabria, 1993.

[24] Q. Mucius Scaevola, op. cit., pág. 585, en el cual se cita a Pissanelli en su informe sobre el Código Civil italiano.

legislaciones forales que le asignaban un usufructo universal legal,[25] otras que establecían un usufructo parcial o sobre una parte de los bienes de la herencia y unas que le atribuían al viudo una cuota en pleno dominio.[26] Se optó por el usufructo parcial, reviviendo, aunque modificada, la fórmula del Fuero Juzgo que, a su vez, coincidía con las disposiciones del Código Civil italiano de 1865.[27]

En el seno de la comisión codificadora también se discutió si la cuota viudal había de extinguirse con la celebración de nuevas nupcias, prevaleciendo el criterio de

---

[25] Se descartó el usufructo universal legal de los regímenes forales porque dificultaba "la constitución de nuevas familias con sus patrimonios respectivos". Q. Mucius Scaevola, op. cit., pág. 590, en donde cita al Sr. Alonso Martínez. Por otro lado, la cuarta marital romana también fue descartada desde el inicio por ser, más que un derecho de la viuda, un "acto de caridad", asunto contrario a la igualdad entre el hombre y la mujer, que era una aspiración en el siglo de la codificación. Íd.

[26] Por ejemplo, el Código de Austria de 1811, el de Italia de 1865 y el de 1942 optaron por el usufructo al entender que los bienes no pueden salir de la familia de donde proceden. F.V. Bonet Ramón, op. cit., págs. 614 y 615. Sin embargo, el Código de Chile de 1855, el de Argentina de 1869 se decidieron por la cuota en propiedad. Íd.

[27] L. Roca-Sastre Muncunill, op. cit., pág. 279; F. Puig Peña, op. cit., pág. 480. En efecto, en la codificación española prevaleció el sistema del Código italiano de 1865, aunque ampliando la proporción del usufructo concedido para fortalecer la posición económico familiar del cónyuge supérstite. Por estas razones es que no hay identidad ni similitud entre las legislaciones forales y la regulación del usufructo viudal en el Código Civil. F.V. Bonet Ramón, op. cit., pág. 616-617.

que continuara el viudo disfrutando su legítima.[28]  Dicho de
otro modo, en la redacción final del proyecto del Código
Civil español de 1888, no se siguió el criterio de las
provincias regidas por fueros especiales.   Así, en el
derecho civil común se entendió, en vez, que el usufructo
viudal no termina ni porque el viudo no lleve una vida
recatada y honesta ni porque contraiga nuevas nupcias.[29]
Tampoco finaliza este derecho por indignidad o por otros
motivos particulares.[30]  Valverde nos explica las razones en
las que se apoya este criterio:

> [S]i a primera vista parece absurdo que participe
> de los beneficios de ella el cónyuge de segundas
> nupcias que viene a ocupar el lugar del fallecido,
> no obstante, razones superiores de moralidad
> aconsejan el aceptar el criterio de subsistencia
> de la cuota aun contrayendo segundo matrimonio.[31]

---

[28] D.C. Valverde y Valverde, op. cit., pág. 246. Otro asunto
sobre el cual batallaron los miembros de la comisión
codificadora fue determinar de qué parte de la herencia
había de restarse la cuota del usufructo. D.C. Valverde y
Valverde, Tratado de Derecho Civil Español, 4ta ed.,
Valladolid, Cuesta, 1939, T. V, pág. 245-246.  Aunque en la
primera votación se decidió que el derecho de usufructo
viudal gravaría el tercio de mejora, luego se modificó,
porque en ese caso, cuando hubieran segundas nupcias, los
hijos del primer matrimonio también soportarían la carga de
quien no era su madre.  Q. Mucius Scaevola, op. cit., pág.
594.  Por eso, finalmente se decidió que cuando todos los
hijos fueran de un mismo matrimonio el tercio de la herencia
que quedará gravado con el usufructo viudal será la mejora,
mientras que cuando los hijos lo sean de distintos
matrimonios, el gravamen pesaría sobre el tercio de libre
disposición.  Íd.

[29] J.M. Manresa y Navarro, op. cit., pág. 933.

[30] Íd.

[31] D.C. Valverde y Valverde, op. cit., pág. 246.

Finalmente, los artículos 834 y subsiguientes del Código Civil español establecieron a favor del cónyuge viudo el derecho al usufructo de una cuota en la herencia del causante.[32] Por otro lado, dicho cuerpo legal, que es, en esencia, igual al nuestro, guardó silencio en torno a las causas especiales para el cese o extinción del usufructo viudal.

Manresa ha expresado que el silencio del Código es, sin duda, prueba de que el legislador entendió que no era necesario usar la autorización que le otorgaba la Ley de Bases de 1888, para determinar las causas de extinción del usufructo viudal.[33] Por el contrario, demuestra que los parlamentarios prefirieron equiparar este derecho a los demás usufructos y dejar subsistentes, respecto a éste, las causas generales de extinción del usufructo, en lo que sean aplicables.[34] Cónsono con ello, los tratadistas Borrell y

---

[32] El Código Civil español fue publicado oficialmente el 6 de octubre de 1888, pero promulgado en una nueva edición corregida el 24 de julio de 1889. J. Trías Monge, _Observaciones sobre el Derecho Puertorriqueño del Siglo XIX_, Conferencia en la Universidad Interamericana, 14 de abril de 1981, pág. 18. La regulación del usufructo viudal en el Código Civil español ha sufrido dos enmiendas posteriores. La primera fue el 24 de abril de 1958. Luego, el 13 de mayo de 1981, se enmendó nuevamente el cuerpo de leyes para llamar a la herencia, en tercer lugar, al cónyuge viudo, tras la línea recta descendiente y ascendiente. J. Santos Briz y otros, _Tratado de Derecho Civil: Teoría y Práctica_, Barcelona, Bosch, 2003, T. VI, pág. 504.

[33] J.M. Manresa y Navarro, _op. cit._, pág. 933.

[34] _Íd._; Artículos 513 al 522 del Código Civil español; Artículos 441 al 450 de Código Civil de Puerto Rico. 31 L.P.R.A. sec. 1571-1580. El artículo 441 de nuestro Código Civil, que corresponde al artículo 513 del Código Civil

Soler afirman que "la causa más natural de extinción [del usufructo viudal] es la muerte del viudo usufructuario, pero puede también ocurrir por cumplimiento de condición resolutoria convenida en el título del derecho, por confusión o por renuncia".[35]

B

En Puerto Rico, hasta finales del siglo XIX, el derecho privado era organizado por estatutos particulares, como las Leyes de Indias, que regían en los territorios españoles de ultramar. Sin embargo, aunque el artículo 89 de la Constitución española de 30 de junio de 1876 mantuvo el principio de que "las provincias de Ultramar serían gobernadas por leyes especiales", también autorizaba al Gobierno a aplicar a dichas provincias las leyes promulgadas o que se promulgasen en España, con las modificaciones que estimara pertinentes y dando cuenta a las Cortes.[36] De este

---

español, dispone que el usufructo se extingue por la muerte del usufructuario, por expirar el plazo, por cumplirse la condición resolutoria, por la reunión del usufructo y la propiedad en una misma persona, por la renuncia del usufructuario, por la pérdida total de la cosa objeto del usufructo, por la resolución del derecho del constituyente y por la prescripción. 31 L.P.R.A. sec. 1571.

[35] A. M. Borrell y Soler, Derecho Civil Español, Barcelona, Bosch, 1954, T. V., pág. 296. El Profesor O'Callaghan Muñoz explica que entre las características del usufructo viudal se destaca el que éste no se extingue por ulterior matrimonio, pero, en tal caso, el viudo tendrá que prestar fianza. X. O'Callaghan Muñoz en I. Sierra Gil de la Cuesta, Comentario del Código Civil, Barcelona, Bosch, 2000, T. IV, pág. 705.

[36] E. Vázquez Bote, Derecho Civil, San Juan, FAS, Ediciones Jurídicas Generales, T.I., V. I, 1972, pág. 110.

modo, "la obra más importante de la legislación española, el Código Civil, fue extendida íntegramente a la Isla" por Real Decreto de 31 de julio del 1889.[37]

Poco tiempo después, en virtud del artículo II del Tratado de Paz o Tratado de París de 10 de diciembre de 1898, que terminó la Guerra Hispanoamericana, el Reino de España le cedió el archipiélago de Puerto Rico a Estados Unidos.[38] Desde ese momento hubo una "alteración natural y comprensible en la orientación jurídica puertorriqueña",[39] pues aunque la estructura jurídica y gubernamental dejada por España se mantuvo durante el periodo del gobierno militar, eso es, entre 1898 y 1900, ésta fue alterada por medio de órdenes militares.[40]

La Ley Foraker puso fin al gobierno militar y estableció en Puerto Rico el primer gobierno civil el 1 de

---

[37] *Íd.*; J. Trías Monge, Observaciones sobre el Derecho Puertorriqueño del Siglo XIX, op.cit., pág. 18.

[38] A.L. García Martínez, La Ciudadanía Puertorriqueña-Concepto del Habitante Natural, 39 Rev. Col. Abog. 241, 241 (1978); 1 L.P.R.A. Tratado de París de 1898 (2008).

[39] *Íd.*, pág. 111. Véase, además: L. Fiol Matta, Civil Law and Common Law in Legal Method of Puerto Rico, 40 Am. J. Comp. L. 783 (1992).

[40] A.L. García Martínez, Idioma y Derecho en Puerto Rico, 20 Rev. Col. Abog. 183, 186-187 (1960).

En el periodo de dieciocho meses de duración del gobierno militar en Puerto Rico se dictaron cientos de órdenes, de la más variada naturaleza. M. Rodríguez Ramos, supra, pág. 257.

mayo de 1900.[41]  Esta ley también ordenó la creación de una
Comisión cuya encomienda era revisar y compilar las leyes de
Puerto Rico en un corto periodo de tiempo que finalizaba el
12 de abril de 1901.[42]  Debido a la tardanza en nombrar los
miembros de dicha comisión, éstos tuvieron sólo nueve meses
para familiarizarse con la situación prevaleciente en la
Isla, acordar los cambios que recomendarían y hacer su
informe al Congreso.[43]  El informe de la Comisión, que
recomendó cambios en las leyes existentes para "adaptarlas a
los principios fundamentales del derecho americano", fue
sometido a la Asamblea Legislativa de Puerto Rico a
principios del 1902.[44]  Además, otra comisión codificadora,
creada en 1901 por una ley de la Asamblea Legislativa,
también entregó su informe para esa fecha.[45]  El 12 de marzo
de 1902, la Asamblea Legislativa aprobó el Código Civil de

---

[41] A.L. García Martínez, Idioma y Derecho en Puerto Rico,
supra, pág. 190; 1 L.P.R.A. Carta Orgánica de 1900 (2008).

[42] 1 L.P.R.A. Carta Orgánica de 1900, sec. 40 (2008); M.
Rodríguez Ramos, supra, pág. 264.

[43] M. Rodríguez Ramos, supra, pág. 264.  La Comisión la
formó un puertorriqueño y dos norteamericanos. Íd.; J. Trías
Monge, La Crisis del Derecho en Puerto Rico, 49 Rev. Jur.
U.P.R. 1, 8 (1980)

[44] Íd, págs.. 264, 270. Debemos indicar que tanto la
Asamblea Legislativa como el Consejo Ejecutivo estaban
formados por norteamericanos desconocedores del derecho
civil y de puertorriqueños que conocían poco sobre el
derecho común estadounidense. Íd., pág. 270. Véase, además:
J. Trías Monge, La Crisis del Derecho en Puerto Rico, supra.

[45] M. Rodríguez Ramos, supra, pág. 270.

Puerto Rico.[46] Este contenía algunas modificaciones importantes, entre éstas, los artículos 821 al 823 declararon al cónyuge viudo heredero en propiedad, sin disponer sobre la terminación de este derecho.[47] Tres años después, la Ley del 9 de marzo de 1905 restableció íntegramente la doctrina del Código Civil español sobre el usufructo viudal.[48]

Posteriormente, la Ley Núm. 48 de 28 de abril de 1930, enmendó más de cincuenta artículos que así modificados se incorporaron, con una nueva enumeración, al texto de otra edición de Código Civil de Puerto Rico.[49] En dicha edición se incluyeron otras leyes civiles que antes no se encontraban en el Código.[50] Sin embargo, los artículos 761

---

[46] 1902 Leyes de Puerto Rico 815; M. Rodríguez Ramos, supra, pág. 271.

[47] 1902 Leyes de Puerto Rico 815, 1024-1025; L. Muñoz Morales, Reseña histórica, op. cit., pág. 32-33; Entre los cambios realizados, además de aquellos exigidos naturalmente por el cambio de régimen, se incorporaron artículos del Código Civil de Louisiana de 1870 y doctrinas opuestas al derecho civil. L. Muñoz Morales, Reseña histórica, op. cit., pág. 23-24. Por otro lado, entre las áreas de derecho que sufrieron modificaciones mayores se encontraban las instituciones del matrimonio y la filiación. Íd.

[48] 1904-1905 Leyes de Puerto Rico 173; L. Muñoz Morales, Reseña histórica, op. cit., pág. 44. Luego, la Ley 73 de 9 de marzo de 1911 enmendó, nuevamente, las disposiciones que regulaban el usufructo viudal para hacerlo aplicable a la sucesión testada y a la intestada. 1910-1911 Leyes de Puerto Rico 234.

[49] 1930 Leyes de Puerto Rico 369. Véase, además: L. Muñoz Morales, Reseña histórica, op. cit., pág. 69-78. L. Muñoz Morales, Anotaciones al Código Civil de Puerto Rico: Libro III, San Juan, Centro Fernández & Co., Inc., 1939, pág. 44.

[50] L. Muñoz Morales, Reseña histórica, op. cit., pág. 72.

al 766, que regulan los derechos sucesorios del cónyuge viudo, se mantuvieron prácticamente inalterados.[51]

C

Trazados los orígenes de los derechos sucesorios del cónyuge supérstite, precisemos la naturaleza de esta institución jurídica, conforme ha sido interpretada por la doctrina y la jurisprudencia de este Tribunal.

El artículo 736 del Código Civil dispone que son legitimarios del causante sus descendientes y, en ausencia de estos, sus ascendientes.[52] También el cónyuge supérstite es heredero forzoso, pero su cuota es en usufructo.[53] Por

_____

[51] Véase: L. Muñoz Morales, Anotaciones al Código Civil de Puerto Rico: Libro III, op. cit., págs. 219-235. El Profesor Muñoz Morales explica que la edición de 1930 del Código Civil de Puerto Rico es similar al Código Revisado de 1902 que, a su vez, es una reproducción enmendada del Código Civil español de 1889, que regía en Puerto Rico antes del cambio de soberanía. L. Muñoz Morales, Reseña histórica y anotaciones al Código Civil de Puerto Rico, Facultad de Derecho, Universidad de Puerto Rico, 1947, pág. 125. Sin embargo, debemos recordar que la enmienda de 1905 a nuestro Código Civil restableció la normativa sobre el usufructo viudal del código civil español, derogando así la disposición adoptada en 1902 que declaraba al viudo heredero en propiedad.

Finalmente, la Ley Núm. 25 de 8 de diciembre de 1990, enmendó el primer párrafo del Art. 761 del Código Civil de Puerto Rico para adecuar la normativa a la jurisprudencia y eliminar la disposición anterior que condicionaba el derecho a que el cónyuge supérstite "[n]o se hallare divorciado, o lo estuviere por culpa del cónyuge difunto". 1990 (Parte II) Leyes de Puerto Rico 1500. Esta enmienda aplica a toda sucesión que se produzca a partir de esa ley, aunque la sentencia de divorcio sea anterior.

[52] 31 L.P.R.A. sec. 2362.

[53] Íd.; 31 L.P.R.A. secs. 2411-2416; Luce & Co. v. Cianchini, 76 D.P.R. 165, 172 (1954). La legítima es la

consiguiente, este tiene que concurrir a las operaciones particionales hasta que los herederos le satisfagan o conmuten su cuota, lo cual puede hacerse asignándole una renta vitalicia, los productos de determinados bienes o capital en efectivo.[54] En otras palabras, hasta que no se haga la conversión, todos los bienes de la herencia estarán gravados por el usufructo viudal.[55] Ahora bien, para que queden adecuadamente protegidos los derechos del cónyuge supérstite, se tomará en consideración el valor de los bienes de la herencia al momento en que se formalice la conversión o conmutación.[56] Además, el viudo no es un

---

porción de bienes que el testador no puede disponer porque la ley la reservó para determinados herederos. Artículo 735 del Código Civil, 31 L.P.R.A. sec. 2361. Si concurre con descendientes, el cónyuge supérstite tiene derecho a una cuota en usufructo igual a la que por legítima corresponda a cada uno de sus hijos o descendientes no mejorados. 31 L.P.R.A. sec. 2411. Ahora bien, si concurre con un solo descendiente, tiene derecho al usufructo de una tercera parte de la herencia. *Íd.* Cuando el cónyuge viudo concurra con ascendientes, tiene derecho al usufructo de una tercera parte de la herencia y cuando sea con colaterales preferentes al usufructo de la mitad de la herencia. 31 L.P.R.A. 2413-2414. Finalmente, si no hay parientes hasta el cuarto grado de consanguinidad, y el causante no dispuso otra cosa en testamento, el cónyuge viudo heredará en propiedad en cuarto grado.

[54] Colón v. Registrador, 114 D.P.R. 850, 858 (1983). De hecho, en este caso resolvimos que para poder inscribir adjudicaciones concretas en el Registro de la Propiedad, es necesario que el cónyuge viudo haya prestado su consentimiento en la escritura pública en la cual se hace la transacción. *Íd.*, pág. 859.

[55] Artículo 765 del Código Civil, 31 L.P.R.A. 2415.

[56] Colón v. Registrador, supra, págs. 861.

extraño a la sucesión en lo que se refiere al retracto sucesoral.[57]

Por otro lado, el derecho del viudo es exigible tanto en la sucesión testada como en la intestada.[58] Además, el usufructo viudal puede atribuirse por el causante a cualquier título: herencia, legado, partición efectuada por el propio causante o por vía de reglas particulares dictadas por éste sobre la partición.[59] Hemos afirmado que el suceso que da vida a este derecho es la muerte del causante.[60]

---

[57] González de Salas v. Vda. de González, 99 D.P.R. 577, 586 (1971).

[58] 31 L.P.R.A. secs. 2411.

[59] L. Roca-Sastre Muncunill, op. cit., págs. 277-278.

[60] Ripoll Alzuru v. Rosa Pagán, 121 D.P.R. 1,10 (1988). En este caso se citó con aprobación un artículo del tratadista José A. Castán en la Revista General de Legislación y Jurisprudencia, sobre las razones por las cuales un nuevo matrimonio debe terminar el usufructo viudal. Sin embargo, debemos aclarar que dicho ensayo se refiere a la legislación civil aragonesa que dispone expresamente que las nuevas nupcias son causa para la extinción de este derecho. Inclusive, en el mencionado texto Castán critica el usufructo viudal adoptado por el Código Civil cuando expresa que:

> La viudedad del Código es una hijuela, una partición más, hecha por la ley con tal inflexibilidad y con tan poca consideración al elemento ético de la familia, que no premia la memoria fiel ni aplica su sanción al olvido. J.A. Castán, La sucesión del cónyuge viudo y el problema de las legislaciones forales, 126 Rev. Gen. Leg. Jur. 24, 35 (1915).

Por último, las referidas expresiones de este Tribunal en Ripoll no son precedente, porque eran innecesarias para resolver la controversia de si al amparo de nuestro Código Civil, en un caso de divorcio por separación, el ex cónyuge supérstite tiene derecho al usufructo viudal. Luego de resuelto este caso, la Asamblea Legislativa de Puerto Rico

También hemos destacado que el usufructo viudal legal es la legítima del cónyuge supérstite, de la cual no se le puede privar por testamento, ni puede el testador imponer sobre ella carga o gravamen alguno, como, por ejemplo, que el viudo no contraiga nuevas nupcias.[61] Ello es así, toda vez que "siendo vitalicio el usufructo viudal concedido, no hay más plazo ni condición que la vida del usufructuario".[62]

                                    III

Explicado lo anterior, debemos resolver si en nuestro ordenamiento jurídico el usufructo viudal cesa o se extingue cuando el viudo o viuda contrae nuevas nupcias. Hemos visto que este asunto se consideró y discutió en la comisión que redactó el Código Civil español y, finalmente, prevaleció la posición de que el derecho al usufructo viudal no se extingue ni cesa por esa causa. También hemos visto que en aquellas jurisdicciones como Navarra y Aragón, donde las nuevas nupcias son causa para terminar el usufructo viudal, la ley foral lo dispone expresamente. Sin embargo, en el Código Civil español y, por consiguiente, en el nuestro, se optó por no hacer expresión alguna sobre la extinción del

---

enmendó el Código Civil para disponer que el cónyuge que tiene derecho al usufructo viudal es aquel que se encuentre casado cuando el causante muere. 1990 (Parte II) Leyes de Puerto Rico 1502.

[61] 31 L.P.R.A. sec. 2367; Luce & Co. v. Cianchini, supra, pág. 172; Díaz Lamoutte v. Luciano, 85 D.P.R. 834, 850 (1962).

[62] Luce & Co. v. Cianchini, supra, 173, citando a Manresa en Comentarios al Código Civil Español, T. VI, pág. 609.

usufructo viudal.   Por tanto, para conocer las  causas de extinción del usufructo viudal debemos referirnos al articulado general de extinción del usufructo, que no contempla esta causal.

Por otro lado, como hemos podido observar, la filosofía que originó la figura del usufructo viudal universal y de la cuarta marital romana, que protegía a la viuda de la pobreza y tenía el propósito de mantener la unión familiar, ha evolucionado de acuerdo a los cambios sociales.  En la época moderna, reconocemos que también se trata "de un derecho recíproco, moldeado al fuego del mutuo cariño… común a los dos cónyuges, [e] independiente de su estado económico de pobreza o riqueza…".[63]  De esta forma, se reconocen los años de amor, sacrificio y convivencia del compañero o compañera. Por eso, el propio Código Civil consagró la calidad de legitimario que tiene el cónyuge supérstite, asignándole un derecho en la herencia del difunto.[64]  Cónsono con ello, según ya expresamos, nuestra jurisprudencia ha resuelto que el testador no puede privar a su cónyuge de su legítima ni imponer sobre ésta carga o gravamen alguno.

Finalmente, debemos mencionar otros dos artículos de nuestro Código Civil que se refieren a los derechos del cónyuge supérstite.  El primero es el artículo 420, que exceptúa al cónyuge sobreviviente de prestar fianza respecto a la cuota usufructuaria que le corresponde en la herencia

---

[63] Q. Mucius Scaevola, op. cit., pág. 591.

[64] Íd.

del otro cónyuge, siempre que los nudo-propietarios sean sus descendientes y mientras no contraiga segundo matrimonio. 31 L.P.R.A. sec. 1542. Véase, además: Artículo 421 del Código Civil, 31 L.P.R.A. sec. 1543. Por otro lado, la reserva viudal, regulada en los artículos 923 al 935 del Código Civil, le impone al viudo o viuda que contrae nuevas nupcias, la obligación de reservar, para los descendientes del matrimonio anterior, la propiedad de los bienes que adquirió del causante, de los hijos de éste y de los parientes del difunto por consideración a éste, mediante testamento, sucesión intestada, donación u otro título lucrativo.[65] Estas disposiciones confirman que la única consecuencia que el Código Civil asigna para cuando el cónyuge supérstite contrae nuevas nupcias surge en esta situación, para la cual adopta una norma específica. Habiendo previsto y regulado este supuesto en los artículos 421 y 923 al 935, antes mencionados, debemos concluir que la ausencia de condiciones al regular la vigencia de la cuota usufructuaria revela la intención de no sujetarla a condición alguna. Dado que el Código es un sistema coherente de normas, podemos deducir que las nuevas nupcias no son causa de extinción de los derechos sucesorios del cónyuge supérstite.

Más aun, sería antagónico que se le exigiera la fianza sobre el usufructo viudal al cónyuge supérstite que va a contraer nuevas nupcias y, por otro lado, se extinga dicho

---

[65] 31 L.P.R.A. secs. 2731-2743.

usufructo por razón del vínculo matrimonial.  Así lo expresa el tratadista Manuel Albaladejo, refiriéndose al artículo 492 del Código Civil español, que es homólogo al 490 de nuestro Código Civil, al afirmar que:

> [e]ste precepto, indirectamente, confirma que no se extingue por ulteriores nupcias el usufructo legal del cónyuge viudo, puesto que ellas sólo dan lugar a que el viudo deba prestar fianza.[66]

La intención de los codificadores, la filosofía tras la figura del usufructo viudal y la interpretación lógica de todas las disposiciones del Código Civil demuestran que en nuestro ordenamiento jurídico el derecho de usufructo viudal no cesa ni se extingue cuando el cónyuge supérstite contrae nuevas nupcias.  Ahora bien, según las disposiciones citadas, tendría que prestar fianza y reservar ciertos bienes para la descendencia de su anterior matrimonio.


IV

Cuando murió doña Amelia, que conforme a nuestra jurisprudencia es el momento determinante para la concesión del usufructo viudal, ésta estaba casada con el señor Clavelo Pérez.  Conforme a lo aquí resuelto, el matrimonio

---

[66] M. Albaladejo, Comentarios al Código Civil y Compilaciones Forales, 2da ed., Madrid, Ed. Revista de Derecho Privado, 1982, T. XI, pág. 457.  Sobre este mismo asunto, el Profesor Castán Tobeñas afirma que

[n]o se extingue… [el] usufructo [viudal] por contraer nuevas nupcias el cónyuge supérstite, como resulta sensu contrario del mismo artículo 492 y de la circunstancia de no establecerse expresamente ese hecho como causa especial de extinción.  J. Castán Tobeñas, Derecho Civil Español, Común y Foral, 8va ed., Madrid, 1979, T. VI, Vol. II, pag. 629.

de el señor Clavelo Pérez, cinco años después de la muerte de doña Amelia, no extinguió el usufructo viudal. Por consiguiente, el señor Clavelo Pérez es acreedor a la cuota viudal usufructuaria.

Por los fundamentos expuestos, se revoca la sentencia del Tribunal de Apelaciones y se reinstala la sentencia del Tribunal de Primera Instancia.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Ángel Francisco Clavelo Pérez<br>Peticionario<br><br>v.<br><br>Gloria Esther Hernández García<br>Recurrida | CC-2007-1166 | *Certiorari* |
| --- | --- | --- |

*SENTENCIA*

En San Juan, Puerto Rico, a 19 de enero de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revoca la sentencia del Tribunal de Apelaciones y se reinstala la sentencia del Tribunal de Primera Instancia.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez concurre sin opinión. El Juez Asociado señor Martínez Torres está inhibido.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo